# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

CASE NO. 12CR133 (DSD/TNL)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

        **REPORT & RECOMMENDATION**

RICARDO CERVANTES-PEREZ,

        Defendant.

Andrew R. Winter and Surya Saxena, Assistant United States Attorneys, **UNITED STATES ATTORNEY'S OFFICE**, 316 N Robert Street, Suite 404, Saint Paul, MN 55101, for the United States of America; and

Manvir K. Atwal, **OFFICE OF THE FEDERAL DEFENDER**, 300 South 4th Street, Suite 107, Minneapolis, MN 55415, for Defendant

## I.

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Docket No. 14).   This matter has been referred to the Court for report and recommendation.  On June 20, 2012, a hearing was held on the motion. Officer Ryan Peterson testified and the following Government Exhibits were offered and received: Exhibit 1 is a DVD video recording of the stop that occurred on March 19, 2012; Exhibit 2 is a copy of the State of Minnesota Traffic Citation issued to Defendant on February 17, 2011; and Exhibit 3 is the Policy and Operating Procedure Manual of the Plymouth

Police, Chapter 600, Policy 603: Impounding and Release of Vehicles. Assistant United States Attorney Surya Saxena appeared at the hearing on behalf of the United States of America (the Government). Manvir K. Atwal appeared on behalf of Defendant.

## II.

Based upon the file and documents contained therein, along with the testimony and exhibits presented at hearing, the undersigned magistrate judge makes the following:

## FINDINGS

On March 19, 2012, Officer Ryan Peterson, a licensed peace officer with five years of experience with the Plymouth Police Department, was performing patrol duties traveling eastbound on Interstate Highway 94 when he notice a white Chevrolet Tahoe with two occupants pass on the left side of his vehicle. Tr. 7:3-8:21, 9:25. Office Peterson testified that he looked at his calibrated speedometer and saw that his squad car was traveling at 60 miles per hour when the Tahoe passed him. Tr. 9:4-7. Officer Peterson testified that the Tahoe was traveling in excess of the posted speed limit, by his estimate traveling 62 or 63 miles per hour.[1] Tr. 8:25. Officer Peterson also testified that

---

[1] Officer Ryan Peterson's squad car is equipped with a video recorder and this device produced Government Exhibit 1, i.e., a video recording of the traffic stop in this matter. Tr. 12:1-6; *see* Gov't Ex. 1. This Court has reviewed Government Exhibit 1. During the first portion of the recording, the camera is facing forward, looking out the front of the squad car. During the second portion of the recording—beginning at approximately five minutes into the recording—the camera faces the interior of the squad car and records Officer Peterson's interaction with Defendant. Government Exhibit 1 is consistent with Officer Peterson's testimony.

the Tahoe was "very clean" and that "it had very fancy rims and the tires looked almost brand new." Tr. 8:25-9:3.

Officer Peterson pulled behind the Tahoe and ran a query of the license plates.  Tr. 10:13-16.  Officer Peterson testified about the query as follows:

> It's called a QMW, and that's just a query of the motor vehicle. The information that came back to me, typically when you do a query on a vehicle, you get two pieces -- multiple pieces of information, but the two primary pieces are who the registered owner of the vehicle is and also what their driving status is and you also get hits whether it's a stolen vehicle or not.

Tr. 10:15-22.   Officer Peterson further testified that when he ran the query on Defendant's vehicle

> the first thing that it told me was that the registered owner was [Defendant] and that it was the correct vehicle. I checked to make sure that is the case. The second part of the information which normally would tell me the driver's license name and their status, that came back as what—it's called a no DL hit and it just says no driver's license information.

Tr. 11:3-9.  Officer Peterson testified that, in his experience, a failure to return driver's license information is an indication that the owner possibly does not possess a valid driver's license. Tr. 11:11-19.  After receiving the results of the query, Officer Peterson initiated a traffic stop.  Tr. 11:18-21.

The Tahoe initially pulled over in an area between two lanes of traffic. Gov't Ex. 1 Officer Peterson then directed Defendant's vehicle to another location because of safety concerns. Tr. 11:23-25; 13:13-25. Once the Tahoe pulled over again, Officer Peterson approached the vehicle and noticed some features he believed were of significance.  Tr.

13:13-14:5. He testified that the interior of the vehicle was "particularly well kept"; there was a single key in the ignition; multiple air fresheners were visible; and a card depicting "Santa Muerte" was also visible. Tr. 14:7-11. Officer Peterson testified that "Santa Muerte" is a religious icon that depicts a skull and a sickle. Tr. 15:7-14. He testified that "Santa Muerte" is often related drug activity. Tr. 15:7-14. He testified that based on his training and experience all of these characteristics are indications of possible criminal activity. Tr. 14:12-15:14; *see also* Tr. 9:10-13.

Officer Peterson testified that Defendant was driving; therefore, Officer Peterson requested Defendant's license and insurance information. Tr. 15:21-22. Defendant provided Officer Peterson with a Mexican identification and two insurance cards. Tr. 15:24-25. Officer Peterson testified that the photo on the Mexican identification card appeared to be Defendant, and the name listed on the identification card was Ricardo Cervantes-Perez. Tr. 16:15-21. Defendant did not provide Officer Peterson with proof that he possessed a valid driver's license. Tr. 15:24-25 and 16:15-21.

Officer Peterson testified that he asked Defendant to accompany him to his squad car. Tr. 17:6-8. Officer Peterson stated that he often separates multiple occupants of a vehicle if he feels they might be engaged in criminal activity. Tr. 17:10-15. Officer Peterson also testified that he brought Defendant to his squad car because he did not want to make multiple trips back and forth between the two vehicles in close proximity to traffic. Tr. 17:16-22.

Officer Peterson seated himself in the driver's seat of his squad car and Defendant in the front passenger seat. Tr. 17:6-8, 18:1-3. Officer Peterson testified that he ran

further queries to determine if Defendant had a valid driver's license.  Tr. 18:6-9.  The queries produced two addresses for Defendant, and Defendant stated that he recognized both.  Tr. 18:12-13. Officer Peterson testified that Defendant had difficulty supplying his current address, which was atypical.   Tr. 18:25-9:4.   Officer Peterson noticed that Defendant "seemed to be nervous," that he saw Defendant's "chest rising up and down a little bit."  Tr. 18:24-25. Officer Peterson testified that during their conversation, Defendant offered a state patrol ticket he had been recently issued for driving without a Minnesota driver's license.  Tr. 19:5-9, 19-20; *see* Gov't Ex. 2.   Officer Peterson confirmed the accuracy of this citation. Tr. 19:21-20:4. Officer Peterson then issued a new traffic citation to Defendant for driving without a license.  Tr. 21:8-9; 17:2-4.

Officer Peterson testified that while he spoke with Defendant, Officer Peterson's partner spoke to the passenger of the Tahoe to determine if he possessed a valid driver's license.  Tr. 20:9-14.  The passenger produced only a Texas identification card and a U.S. passport card, neither of which authorized the passenger to drive.  Tr. 20:15-21:6.

Officer Peterson decided to tow the Tahoe. Tr. 21:11-12. Officer Peterson offered two reasons for his decision:  First, the vehicle was a safety hazard in its present location. Tr. 21:14-16.  Second, failing to tow the vehicle would permit further criminal activity, i.e., driving without a valid license. Tr. 22:12-24.   Plymouth Police Department Policy 603 states: "The policy of Plymouth Police is to impound all vehicles parked upon any street or highway when such vehicles constitute a hazard to the public." Gov't Ex. 3.  The policy further states that "[a] Plymouth Police Officer will impound any motor vehicle

which is . . . [d]riven by a person that is likely to commit further criminal activity, demonstrated by prior record of similar offenses . . . ." *Id.*

Officer Peterson testified that it is the policy of the Plymouth Police Department to perform an impound search of a vehicle prior to towing. Tr. 21:23-22:3; 23:2-5; *see also* Gov't Ex. 3.  The policy states: "When a vehicle is impounded for other than evidentiary purposes, a cursory examination of the interior of the vehicle, including the glove compartment, unlocked containers and trunk shall be made." Gov't Ex. 3. The policy also states: "Closed containers will be opened to determine if they contain items of value." *Id.* The policy also states: "Locked or sealed containers, including but not limited to the trunk and storage compartments, will be checked to determine if they contain items of value provided that the method used to gain access can be accomplished without causing damage." *Id.*

Officer Peterson informed Defendant that he was going to tow the Tahoe, Gov't Ex. 1 (16:00-17:00), and Defendant was asked if there was anything of value in the Tahoe.  Gov't Ex. 1 (17:00-17:20).  Defendant indicated that his clothes were in the Tahoe.  Gov't Ex. 1 (17:00-17:20).  Thereafter, Officer Peterson and another officer began to search the Tahoe, and noted a hidden compartment in the passenger-side door. Tr. 23:20; 33:22-25.  When asked how the compartment opened, Officer Peterson testified that "you could see, like, it was loose and you could lift up the—like the arm rest part." Tr. 34:1-3.  Thereafter, Officer Peterson requested Defendant sit in the squad car again. Gov't Ex. 1. Once they were both inside the squad car again, Officer Peterson and Defendant had the following exchange:

> OFFICER: Okay, I was just going to ask you, um, do you mind if we search your vehicle? I mean we're searching it anyways. But, I'm just wondering if you're okay with that. We're searching it because we're inventorying it for when we tow it. Do you mind if we search it just to look through it? Do you have a problem with that?
>
> DEFENDANT: No problem.

Gov't Ex. 1 (32:30-35:55).   Officer Peterson then provided Defendant with a consent form that was written in English and Spanish.   Tr. 24:7-11.   Defendant looked at the form approximately 20 seconds.   Gov't Ex. 1.   Defendant then gave a verbal indication that he finished reviewing the form.   *Id.* Officer Peterson handed Defendant a pen with which to sign and date the form, and Defendant did so.   *Id.*; *see also* Tr. 24:12-13.   The form signed by Defendant was not offered into evidence.

The officers resumed their search. Tr. 25:1-2.   Near the back seat of the Tahoe, the officers discovered a laundry basket filled with clothes. Tr. 25:4-6.   Beneath six inches of clothing, the officers discovered a can of Pringles potato chips that "weighed a lot." Tr. 25:6-11.   The officers opened the can and found "a gallon plastic bag filled with a white sharded (sic) crystal substance." Tr. 25:10-15.   Officer Peterson suspected that the bag contained methamphetamine. Tr. 25:18.   Defendant was then arrested. Tr. 36:20-21.

## III.

Based upon the foregoing Findings, the undersigned magistrate judge makes the following:

## CONCLUSIONS OF LAW

Defendant moves to suppress the evidence found during the search of the Chevrolet Tahoe, arguing (1) the police lacked probable cause to stop his vehicle; and (2) even if the stop of his vehicle was valid, the subsequent search was illegal.  For the reasons set forth herein, this Court recommends that Defendant's motion be denied.

### A.    The Stop of the Tahoe

"Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion."  *Segura v. United States*, 468 U.S. 796, 804 (1984).  "A traffic stop is reasonable under the Fourth Amendment 'if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred.'"  *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1109 (8th Cir. 2007) (quoting *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2007)).  A traffic violation is not a necessary predicate of a traffic stop; only "reasonable suspicion supported by articulable facts that criminal activity may be afoot" is needed.  *United States v. Robinson*, 670 F.3d 874, 876 (8th Cir. 2012).  When reviewing a police officer's decisions to stop a vehicle based on a reasonable suspicion, a court

> must determine whether the facts collectively provide a basis
> for reasonable suspicion, rather than determine whether each
> fact separately establishes such a basis.  To be reasonable,
> suspicion must be based on specific and articulable facts that

>are taken together with rational inferences from those facts —
>that is, something more than an inchoate and unparticularized
>suspicion or hunch.

*Id.* (internal quotes and citations omitted).

This Court concludes that the stop of the Tahoe was reasonable because it was supported by specific and articulable facts to support that traffic violations had occurred. First, Officer Peterson had a reasonable, articulable basis for suspecting that Defendant, who was driving, was violating the posted speed limit. Officer Peterson's credible testimony, which is corroborated by Government Exhibit 1, supports that Defendant's vehicle was exceeding the posted speed limit. Defendant's arguments that he was "going with the flow of traffic," and that there "was no testimony about the alleged speeding being tagged on the radar" are immaterial. Docket No. 28 at 7. "[A]n officer's observation of a traffic violation, however minor, gives the officer probable cause to stop a vehicle, even if the officer would have ignored the violation but for a suspicion that greater crimes are afoot." *United States v. Luna*, 368 F.3d 876, 878 (8th Cir. 2004).

Second, Officer Peterson had a reasonable, articulable basis for suspecting the driver of the vehicle did not have a valid driver's license. Officer Peterson testified that his query returned a report that had no driver's license information associated with the vehicle. *See United States v. Coplin*, 463 F.3d 96, 101 (1st Cir. 2006) (objectively reasonable suspicion existed where officer relied on fact that the squad car computer indicated owner's license was suspended). Driving without a valid license is a violation of Minn. Stat. § 171.02 (1).

B.      The Search of the Tahoe

1.      Inventory Search

In the context of the Fourth Amendment, the Supreme Court "has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents." *South Dakota v. Opperman*, 428 U.S. 364, 373 (1976); *Colorado v. Bertine*, 479 U.S. 367, 371 (1987) (stating "inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment").

Officer Peterson's decision to impound Defendant's vehicle was consistent with the written policy of the Plymouth Police Department.   First, Defendant's vehicle constituted a public safety hazard because it was pulled over on the right shoulder of an interstate highway at mid-afternoon.   *See* Gov't Ex. 1.   Second, Officer Peterson had reason to believe that not impounding the vehicle would result in the continued violation of law. Neither Defendant nor his passenger possessed a driver's license which would enable them to remove lawfully the vehicle to a safe location.   Moreover, Defendant had been previously ticketed for driving without a valid license.

When a vehicle is lawfully impounded, "[a] warrantless inventory search must be done pursuant to standard police procedures and for the purpose of protecting the car and its contents."  *United States v. Betterton*, 417 F.3d 826, 830 (8th Cir. 2005).  The three primary reasons for an inventory search are "the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over

lost or stolen property, and the protection of the police from potential danger. *Opperman*,

428 U.S. at 369. The Eighth Circuit Court of Appeals has explained as follows:

> [t]he search of a vehicle to inventory its contents must [] be reasonable under the totality of the circumstances, and may not be a ruse for a general rummaging in order to discover incriminating evidence. The reasonableness requirement is met when an inventory search is conducted according to standardized police procedures, which generally remove the inference that the police have used inventory searches as a purposeful and general means of discovering evidence of a crime.

*United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011) (internal quotes and cites

omitted).

This Court concludes that, based on the totality of the circumstances, the search of

the Tahoe constituted a reasonable inventory search. Defendant makes two arguments in

opposition to the search. First, Defendant contends that the inventory search was

unreasonable because the officers searched the "hidden compartment" in the passenger-

side door. But, in the present case, the "hidden compartment" was not actually hidden.

The "hidden compartment" was noticed because there was a crack in the passenger door.

Tr. 34:2-3; 36:7-12. The compartment was loosely closed and could be lifted up to reveal

its contents. The compartment was not sealed. It did not require tools to open. It did not

require dismantling the door. Thus, looking into a loosely closed compartment is not

beyond the "cursory" search described in written policy.

Second, Defendant contends that the search of laundry basket and of the Pringles

can exceeded the "cursory examination" anticipated by the policy of the Plymouth Police

Department. This Court disagrees. The Plymouth Police Department's policy described

the places to be searched in a vehicle and the methods to be employed.  The opening of the unusually heavy Pringles fell well within the parameters of the policy.  *Cf. Florida v. Wells*, 495 U.S. 1, 4 (1990) (stating "[a] police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself"). Defendant indicated that his clothing constitute items of value; therefore, the officers were right to go through all of the clothing.

### 2.    Probable Cause

The Government argues in the alternative that after the officers discovered the hidden compartment, the officers had probable cause to search the vehicle for contraband. This Court agrees.

"As long as the law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception. Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000).

In the present case, the following facts amount to probable cause to believe that contraband or evidence would be found in the Tahoe:  First, the officers observed an exposed hidden compartment during the start of their inventory search. *See United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir. 2002) (holding that "[i]t is well established that evidence of a hidden compartment can contribute to probable cause to search");

*United States v. Martel-Martin*es, 988 F.2d 855, 858-59 (8th Cir. 1993) (finding probable cause based upon inconsistent statements to routine questions and the presence of a sealed hidden compartment). Second, the vehicle was extremely clean, had expensive rims, a single ignition key, two air fresheners, and Santa Muerte card. *See United States v. Calvo-Saucedo*, 409 F. App'x 21, 25 (7th Cir. 2011) (finding probable cause based in part on single ignition key); *United States v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000) (finding probable cause based in part on air freshener). Officer Peterson testified that all of these facts are associated with illegal narcotics activity. *See United States v. Cortez-Palomino*, 438 F.3d 910, 913 (8th Cir. 2006) ("In determining probable cause, law enforcement officers may draw inferences based upon their experience."). Third, there were two separate insurance cards, and neither individual in the Tahoe had a valid driver's license. Finally, Defendant had difficulty supplying a current address and "seemed to be nervous." *United States v. Mayo*, 627 F.3d 709, 713 (8th Cir. 2010) (finding probable cause where the defendant's "extreme nervousness, include[ed] heavy breathing, sweating, a visible pulse in his neck, and avoidance of eye contact").

### C.    Consent Search

The Government also argues in the alternative that the search of the Tahoe was reasonable based upon Defendant's free and voluntary consent. The Eighth Circuit Court of Appeals has explained:

> The test applied to determine if consent is free and voluntary is whether, in light of the totality of the circumstances, consent was given without coercion, express or implied. The government bears the burden of showing consent was freely

and voluntary given and not a result of duress or coercion, and the burden cannot be discharged by showing mere acquiescence to a claim of lawful authority. Rather, the government must show that a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unconstrained choice, and that the subject comprehended the choice that he or she was making.

*United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005).

There are certainly facts that weigh in favor of finding that a reasonable person would have believed that Defendant gave free and voluntary consent.  For example, Defendant is 29 years old; Defendant was presented with, and signed, a consent form, which was written in both Spanish and English; Defendant was sober; Defendant was not threatened or intimidated by officers; Defendant was not under arrest; and consent was sought during the day, along a public freeway. *See United States v. Chaidez*, 906 F.2d 377, 381-82 (8th Cir. 1990) (holding that consent was voluntary in part where the record supported that the defendant had sufficient comprehension of English; was a sober adult with a previous conviction; was questioned only briefly; was not threatened, physically intimidated, or punished; did not rely upon any promises or misrepresentations; was sitting in a squad car parked on the shoulder of public highway during the day).

Notwithstanding the aforementioned facts, Officer Peterson's request came after Defendant was already informed that his vehicle was getting towed and after a search was already underway.  Moreover, the consent form was not offered into evidence such that this Court is able to review what Defendant considered and signed.  Finally, Defendant was told that the search would occur regardless of whether he consented or not.  *Cf.*

*United States v. Yousif*, 308 F.3d 820, 831 (8th Cir. 2002) (finding that consent was not voluntary where the officer's statement to the defendant could be interpreted as "if [the defendant] refused to consent to the search, the officers would search the vehicle anyway"); *United States v. Morgan*, 270 F.3d 625, 631 (8th Cir. 2001) (stating that the defendant did not voluntarily consent to a search of the van where officer stated if defendant withheld his consent, officer would conduct a dog sniff of the van).  Based upon the totality of circumstances, this Court concludes that the Government has not shown by a preponderance of the evidence that a reasonable person would have believed that Defendant gave free and voluntary consent.

## IV.

Based on the foregoing Findings and Conclusions, the undersigned magistrate judge makes the following:

### RECOMMENDATION

For the reasons set forth herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence Obtained as a Result of a Search and Seizure (Docket No. 14) be **DENIED**.

Dated: July 21, 2012

_____*s/ Tony N. Leung*_____
Magistrate Judge Tony N. Leung
United States District Court
for the District of Minnesota

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **August 5, 2012**.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within ten days of receipt of the Report.